## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

DINO DROP, INC., a Michigan
Corporation,

Case No: 09-cv-10759

Hon: Paul D. Borman

       Plaintiff/Counter Defendant,

vs.

THE CHASE BAR & GRILL, L.L.C., a
Michigan Corporation; BACMAR, LLC, a
Michigan Corporation, MARTINEZ
MANAGEMENT GROUP and, PHILIP M.
MARTINEZ, TERY MARTINEZ, ADAM
MASON, BRET C. KONOL and DAVE
BASTIANELLI, Individually and Severally,

       Defendants/Counter Plaintiffs.

_____

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
## JUDGMENT AS TO COUNTS I, II, III, IV & VII

Plaintiff, DINO DROP, INC., a Michigan Corporation ("Dino"), by and through its attorneys,

GARAN, LUCOW, MILLER, P.C., brings this motion for summary judgment as to liability only

with respect to Count I - Unfair Competition, Lanham Act (15 U.S.C. §1125(a)); Count II - Unfair

Competition - Common Law; Count III - Infringement of Common Law Trademark; Count IV -

Infringement of Common Law Trade Dress; and Count VII - Injunctive Relief, pursuant to Fed. R.

Civ. P. 56(C) for the reasons set forth in the accompanying brief.

Plaintiff Dino Drop sought concurrence via written correspondence dated August 23, 2010,

in the relief requested herein pursuant to L.R. 7.1 from defendants.  Concurrence was never received.

WHEREFORE, Plaintiff DINO DROP, INC., respectfully requests this Honorable Court enter an order finding defendants engaged in unfair competition pursuant to the Lanham Act (15 U.S.C. §1125(a)); common law unfair competition; infringement of Dino Drop's common law trademark; infringement of Dino Drop's common law trade dress; and that defendants are enjoined from using any name, symbol or trade dress that is likely to cause confusion with the common law trademark and trade dress owned by Dino Drop.

GARAN LUCOW MILLER, P.C.

s/Timothy J. Jordan
TIMOTHY J. JORDAN (P46098)
ROBERT D. GOLDSTEIN (P38298)
Attorneys for Plaintiff/Counter Defendant
1000 Woodbridge Street
Detroit, MI    48207
(313) 446-5531
tjordan@garanlucow.com
P46098

Date:   August 31, 2010

900907.1

2

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

DINO DROP, INC., a Michigan
Corporation,

       Plaintiff/Counter Defendant,

vs.

THE CHASE BAR & GRILL, L.L.C., a
Michigan Corporation; BACMAR, LLC, a
Michigan Corporation, MARTINEZ
MANAGEMENT GROUP and, PHILIP M.
MARTINEZ, TERY MARTINEZ, ADAM
MASON, BRET C. KONOL and DAVE
BASTIANELLI, Individually and Severally,

       Defendants/Counter Plaintiffs.

Case No: 09-cv-10759
Hon: Paul D. Borman

---

## BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL
## SUMMARY JUDGMENT AS TO COUNTS I, II, III, IV & VII

## TABLE OF CONTENTS

**Page**

INDEX OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

STATEMENT OF ISSUES PRESENTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

FACTUAL STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

LEGAL ANALYSIS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## INDEX OF AUTHORITIES

**Cases** **Page**

*Aero-Motive Co. v. U.S. Aeromotive, Inc.,*
  922 F.Supp. 29, 41 (W.D. Mich. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242, 249 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Audi AG v. D'Amato,*
  469 F.3d 534, 543 (6th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Autozone, Inc. v. Tandy Corp.,*
  373 F.3d 786, 798 (6th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Blockbuster Entertainment Group v. Laylco, Inc.,*
  869 F.Supp. 505 (E.D. Mich. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Celotex Corp. v. Catrett,*
  477 U.S. 317, 323 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.,*
  109 F.3d 275, 283 (6th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 17, 18

*Estate of Mauro v. Borgess Medical Center,*
  137 F.3d 398 (6th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Foodland Distributors v. Al-Naimi,*
  220 Mich. App. 453, 456 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Frisch's Rest., Inc. v. Elby's Big Boy of Steubenville, Inc.,*
  670 F.2d 642 (6th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 18

*General Motors Corp. v. Keystone Automotive Industries, Inc.,*
  453 F.3d 351, 352 (6th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 16, 17, 18

*Gledhill v. Fisher & Co.,*
  272 Mich. 353 (1935). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Gregg v. Allen Bradley Co.,*
  801 F.2d 859, 861 (6th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Herman v. Mobile Homes Corp.,*
  317 Mich. 233, 243-245 (1947). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Induct-O-Matic Corp. v. Inductotherm Corp.*,
    747 F.2d 358, 363 (6th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574, 587 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Moore v. Philip Morris Cos.*,
    8 F.3d 335, 339-40 (6th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Papo v. Aglo Restaurants*,
    149 Mich. App. 285, 302 n 15 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Paul v. University Motor Sales Co.*,
    283 Mich. 587, 602 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*People v. Michigan Bell Telephone Co.*,
    246 Mich. 198, 204-205 (1929) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Rymal v. Baergen*,
    262 Mich. App. 274, 293-294 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United Rentals (N. Am.), Inc. v. Keizer*,
    355 F.3d 399, 406 (6th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Wells v. Firestone Co.*,
    421 Mich. 641, 650 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*Winn Oil Co. v. Thomas*,
    839 F.2d 1183, 1186 (6th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 17

**Statutes/Court Rules/Other Authority**

*Black's Law Dictionary (7th ed.)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Fed. R. Civ. P. 11(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Civ. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Lanham Act 15 U.S.C. §1125 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 23

*McCarthy on Trademarks and Unfair Competition*, §23.15[3] (1995) . . . . . . . . . . . . . . . . . . . 15

## STATEMENT OF ISSUES PRESENTED

Defendants are liable, as a matter of law, to Dino Drop with respect to Count I - Unfair Competition, Lanham Act (15 U.S.C. §1125(a)); Count II - Unfair Competition - Common Law; Count III - Infringement of Common Law Trademark; Count IV - Infringement of Common Law Trade Dress; and Count VII - Injunctive Relief pursuant to Fed. R. Civ. P. 56(C) based on defendants' unauthorized use of Dino Drop's common law intellectual property (trademark and trade dress) following receipt of a cease and desist letter.

## FACTUAL STATEMENT

Plaintiff Dino Drop, Inc. is a domestic profit corporation formed in June of 2000.  Since that

time, Dino Drop, Inc. ("Dino") has owned and operated a restaurant/bar/catering business in

Ferndale, Michigan under the name "Dino's Lounge" - - generally referred to as "Dino's."

Defendants in this case include Philip Martinez, his wife Teri Martinez and his nephew

Adam Mason[1].  Other defendants include The Chase Bar & Grill, owned by Bret Konol and Dave

Bastianelli (at least through July of 2010) as well as the Martinez Management Group and BacMar,

LLC.  BacMar, LLC (formed from the first letters of Dean **Bac**h and Philip **Mar**tinez's last names)

is "owned" by Teri Martinez and Adam Mason.  However, despite forming BacMar in or about

October 2008, Mr. Mason, Mr. Martinez and Mrs. Martinez testified that they have never held any

corporate meetings, do not maintain any corporate minutes or otherwise take any steps to ensure that

the "corporation" is operated as a corporation[2].  The Martinez Group, according to Philip Martinez,

has as its members:  Philip Martinez; Teri Martinez; Thomas Martinez; Philip Martinez' sister

_____

[1]Bret Konol and Dave Bastianelli were initially identified individually as defendants in this matter.  While plaintiff contends they remain liable to plaintiff as owners of The Chase Bar & Grill as well as by way of their individual actions, plaintiff assented to these defendants' request to be dismissed by way of a stipulated order submitted to defendants on August 23, 2010 and attached hereto as **Exhibit 1**.  However, at the time of filing this motion defendants rejected the dismissal of Bret Konol and Dave Bastianelli (as had been requested by these two defendants) unless plaintiff also paid these individuals approximately $8,000.  Because plaintiff has refused defendants' attempt to extort payment from plaintiff to dismiss these two defendants as requested, they remain, for purposes of this motion, defendants and any finding of liability should apply equally to them.  Despite plaintiff agreeing to their dismissal on August 23, 2010, these defendants, in violation of Fed. R. Civ. P. 11(c)(2), filed a "Rule 11" motion on August 28, 2010, Document No. 70.

[2]It is plaintiff's position, as set forth _infra_, that this court should deem BacMar nothing more than the alter ego of Adam Mason and Teri Martinez and allow plaintiff to pierce the corporate veil and hold Adam Mason and Teri Martinez personally liable for any and all actions taken by BacMar in violation of any agreements reached with Dino Drop and/or the use of Dino Drop's intellectual property.

1

Ramona; father-in-law Wayne; and brother-in-law Chad[3].   The remaining defendant is The Chase Bar & Grill which was the owner of the bar/restaurant operating in Northville during the time frame of infringement.

In the summer of 2008 Bret Konol met with Dean Bach, an owner and agent of Dino Drop, on at least five separate occasions about Dino Drop purchasing an establishment in Northville, Michigan then operating under the name "The Chase Bar & Grill."  Based on those discussions, which were to culminate in the purchase of The Chase Bar & Grill by Dino Drop, Dean Bach and other individuals from Dino Drop began operations to reopen The Chase Bar & Grill to prevent the liquor license from being forced into escrow.  This required Dean Bach, and others on his team, to enter The Chase Bar & Grill premises and start taking action to reopen the bar/restaurant.

At the same time Dean Bach and others from Dino's were preparing to open The Chase Bar & Grill, unbeknownst to Mr. Bach, defendant Philip Martinez was also meeting with Brent Konol and/or others about purchasing The Chase Bar & Grill.  Philip Martinez, unaware of Mr. Bach's involvement, testified he saw "people in there cleaning up, looking like they're ready to open the doors again" one day while driving to a client, noting the bar was at this point closed.  **Exhibit 2**, Philip Martinez Deposition, pp. 24-25.

It ultimately came to light that Mr. Konol was negotiating with at least three separate "groups" about purchasing The Chase Bar.  With multiple bidders, each bidding against the other, the price for the bar continued to increase to the point where Dino Drop was no longer interested in

---

[3]Like BacMar, independent of any liability the Martinez Group has as an entity, the court should deem the Martinez Group nothing more than the alter ego of Philip and Teri Martinez and allow plaintiff to pierce the corporate veil and hold Philip Martinez and Teri Martinez personally liable for any and all actions taken by Martinez Group in violation of any agreements reached with Dino Drop and/or the use of Dino Drop's intellectual property.

purchasing the bar despite Konol having originally agreed to sell the establishment to Dino Drop. At this point it appeared Philip Martinez and his investors would be the ultimate purchasers of The Chase Bar.

Shortly after Dean Bach, as agent of Dino Drop, concluded that the bar in Northville was no longer a viable option with a bidding war taking place, he received a phone call from Philip Martinez in August of 2008.  As testified to by Mr. Bach, upon calling Mr. Bach, "he [Philip Martinez] had indicated that he was the other guy in the bidding war and that he would like to come and talk to me about The Chase Bar."  **Exhibit 3**, p. 27  That same day a meeting took place between Dean Bach, Philip Martinez, Teri Martinez and their daughter at Dino's Lounge in Ferndale.  According to Mr. Bach's testimony, Mr. Martinez stated that he really liked Dino's restaurant, indicated that he enjoyed the food and that his daughter really enjoyed the food as well.  Mr. Martinez then informed Mr. Bach that he would like to "mimic" Dino's in Northville.  **Exhibit 3**, pp. 28-29

At the deposition of Mr. Martinez, the following dialogue took place:

Q.     So for whatever reason, you and Bret aren't connecting and getting in touch with Dean, you take it upon yourself to call Dean yourself?

A.     That's correct.  I call his bar, Dino's Lounge.

Q.     And as far as you can recall, that phone call is occurring before the Victorian Festival weekend where the bar opens up for the weekend.?

A.     I believe it is, yes.

Q.     Okay.  Again, I'm just trying to get the timeline because that's how my brain works.  So you call Dean at his establishment in Ferndale?

A.     Yes, sir.

Q.     Did you get him on that first phone call?

3

A.      I believe I did, yes.

Q.      What do you recall as far as the sum and substance of that telephone conversation?

A.      My recollection is that it's my understanding that you're interested in teaming up, and so, you know, can I swing by tonight and meet you. **Exhibit 2**, pp. 42-43

In further support of Mr. Bach's testimony, Mr. Martinez testified as follows:

A.      I pointblank asked Dean what do you want me for because you know why I want you, you're the - - you got operations.

Q.      And what was the response?

A.      You got the money.

Q.      So you have money, Dean has experience?

A.      Yes.

Q.      Where did the conversation go from there?

A.      Let's see what we can work out.

Q.      Was that the sum and substance of that particular meeting or did you get into more details?

A.      That was about the extent of business.

Q.      So at this point Dean recognizes you're buying it and have the money to do it, you recognize Dean owns a bar/restaurant and runs it, and you're willing - - both willing to pursue additional discussions as to whether or not you can figure out a way to partner up?

A.      Yes, sir.  **Exhibit 2**, pp. 45-46

Based upon the discussions held at Dino's Ferndale, Mr. Bach and Mr. Martinez set a golf

date for the following day to continue their discussions.  During the golf game discussions included

4

the idea of a licensing fee[4] for Dino Drop's trademark and trade dress as well as Dino Drop being a partner (owner) in the Northville bar.

The golf game ended with an "agreement to agree - - Dean Bach and Philip Martinez agreeing to be partners (co-owners) with specific details to be worked out.  Dino Drop would be a partner, not through capital, but based on the knowledge and sweat equity of Dean Bach and other employees of Dino's Drop.

A few days later a follow up meeting took place between Dean Bach, Philip Martinez and Adam Mason.  Refining the terms reached during the golf game, it was agreed at this meeting that Dino Drop would be a one third owner of the Northville location as well as receive a 3% licensing fee for use of its intellectual property from gross revenues.  An agreement was reached at this meeting wherein Dino Drop would be a one third owner of the Northville location (as written on a napkin maintained by Philip Martinez but never produced) as well as receive a 3% licensing fee from gross revenues.  **Exhibit 3**, p. 76, lines 10-23.

Based upon these agreements, Dean Bach, acting on behalf of Dino Drop, and with full authority from Philip Martinez, began refashioning The Chase Bar & Grill to be a sister restaurant of Dino's Lounge of Ferndale[5].  It was agreed upon by all parties that the restaurant would be called "Dino's Sports Lounge."  With the name decided (Dino's Sports Lounge), Mr. Bach ordered a sign

---

[4]The licensing fee was to be 3% of gross proceeds which would pay for the use of Dino's trademark, trade dress and menu.

[5]Without question, Mr. Bastianelli and Mr. Konol remain liable for the improper use of Dino Drop's intellectual property as Mr. Martinez testified that The Chase Bar & Grill remained the owner of the bar in Northville.  He further testified that he ultimately had to have the authority of Mr. Konol and Mr. Bastianelli for the renaming and reopening to take place.  **Exhibit 2**, pp. 59-60, lines 23-14.

for the Northville location as well as began construction of the menus and overall design of the restaurant[6]. Menu items included many as used at Dino's of Ferndale, including the following examples:

**Plaintiff Dino's Lounge**:

Classic Maurice - A fresh seasonal lettuce blend with Black Forest ham, roasted turkey, hard boiled egg, vine ripe tomatoes, red onion, cheddar & Swiss cheese. Served with Hudson's style Maurice dressing.

**Defendant Dino's Sports Grill:**

Classic Maurice - A fresh seasonal lettuce blend with Black Forest ham, roasted turkey, hard boiled egg, vine ripened tomatoes, red onion, cheddar & Swiss cheese. Served with Maurice dressing.

**Plaintiff Dino's Lounge:**

Fish & Chips - Fresh North Atlantic Cod hand dipped in a tempura beer batter & deep fried to a crispy golden brown served with shoe string fries & coleslaw.

**Defendant Dino's Sports Grill:**

Fish & Chips - Fresh North Atlantic Cod hand dipped in a tempura beer batter & deep fried to a crispy golden brown served with shoe string fries & coleslaw.

**Plaintiff Dino's Lounge:**

Portobella Burger - Fresh Portobella mushroom caps toasted with red peppers, and caramelized onions. Topped with crisp spinach, melted provolone cheese, and spicy mayo, all served on an onion roll.

**Defendant Dino's Sports Grill:**

Portobella Burger - fresh Portobella mushroom caps toasted with red peppers and caramelized onions. Topped with crisp spinach, melted provolone cheese, and spicy mayo. Served on an onion roll.

---

[6]Mr. Martinez admitted at his deposition that he had the ultimate say/decision on what the establishment would be called. **Exhibit 2**, pp. 58-59, lines 19-2.

**Plaintiff Dino's Lounge:**

Hot Italian Sub - Bavarian ham, Genoa salami, Sicilian pepperoni & mozzarella baked in a fresh ciabatta baguette.  Topped with lettuce, slice red onion, tomatoes, & pepperoncini. served with a side of Italian dressing.

**Defendant Dino's Sports Grill:**

Hot Italian Sub - Bavarian ham, Genoa salami, Sicilian pepperoni & mozzarella baked in a fresh ciabatta baguette.  Topped with lettuce, slice red onion, tomatoes, & pepperoncini. served with a side of Italian dressing.

**Plaintiff Dino's Lounge:**

Grilled Maurice - Bavarian ham, roasted turkey, cheddar & Swiss cheese, sliced red onion, lettuce & tomato.  Flat grilled on polish marble rye bread & served with a side of our Hudson's Maurice dressing.

**Defendant Dino's Sports Grill:**

Grilled Maurice - Bavarian ham, roasted turkey, cheddar & Swiss cheese, sliced red onion, lettuce & tomato.  Flat grilled on polish marble rye bread & served with a side of our Maurice dressing.

**Plaintiff Dino's Lounge:**

Catering - Anytime, Anywhere, Anything you want.  Dino's can take care of all your catering needs.  Food, Beverage, Tents, Coordinating, Etc. . .

**Defendant Dino's Sports Grill:**

Catering - Anytime, Anywhere, Anything you want.  Dino's can take care of all your catering needs.  Food, Beverage, Tents, Coordinating, Etc. . .

In all, more than eight employees of Dino's Ferndale were involved in working at Dino's Northville in order that the establishment could be up and running in time to prevent the liquor license from falling into escrow.

True to his word, Dean Bach was able to open as Dino's Sports Lounge on September 17,

2008, coincidentally coinciding with the Victorian Festival which takes place annually in Northville. After being open for a couple of days, the establishment once again closed temporarily to complete the transformation from The Chase Bar & Grill to Dino's Sports Lounge. Dino's Sports Lounge then reopened in early October 2008. In keeping with the agreement Mr. Bach had secured with Adam Mason and Philip Martinez, Dean Bach continued to help manage Dino's Sports Lounge (Northville) and began working with local media to promote the newly branded restaurant, including, but not limited to: appearing on Channel 2; participating in Rotary Club charities; private interviews with local newspapers; and working with the Northville High School Drama Club. While engaging in this activities, Mr. Bach continued to request Mr. Martinez memorialize their agreements. Despite Mr. Martinez dragging his heels, accepting Mr. Martinez at his word, Mr. Bach continued to focus his attention on running the new establishment.

Eventually, it became clear to Mr. Bach that Mr. Martinez and his fellow defendants would not honor any of the agreements that had Dino Drop being a one third owner, receiving one third of the 10% gross revenue that was to be received by the Martinez Management Group (a/k/a Martinez Group) and/or pay Dino Drop a 3% licensing fee based on monthly gross revenue. This harsh reality came to light on or about November 24, 2008. In early December 2008, negotiations took place regarding defendants' breach and possible methods of resolution, including a licensing fee of 5% of gross sales and/or payment of some money. Unfortunately, by mid December it was clear that defendants were no longer going to honor any of the agreements. As a result, on or about December 17, 2008, defendants were advised to cease and desist all use of the trademark and trade dress owned by Dino Drop. **Exhibit 4**

With defendants unwilling to acknowledge any responsibility, unwilling to compensate Dino

Drop for all of its efforts and continued use of its intellectual property, Dino Drop was forced to initiate a lawsuit on February 27, 2009.  Responding to that lawsuit, defendants admitted, by way of an affirmative defense, that plaintiff Dino Drop licensed to defendants the use of plaintiff's intellectual property rights.  (Document No. 12, p. 9, ¶6)

Defendants also decided to file a counterclaim which included a count for "breach of contract."  Specifically, defendants (including Konol and Bastianelli) stated "to the extent counterclaim-defendant has any rights in a mark containing the term 'Dino's,' it through one of its principals Mr. Dean Bach, expressly authorized Counterclaim-Plaintiffs to utilize the mark in connection with its restaurant in Northville."  (Document No. 13, ¶29) Defendants further stated "counterclaim-defendant's attempt to revoke this authorization given to counterclaim-plaintiffs to use a mark containing the word 'Dino's' has caused it significant harm and damage including the loss of goodwill and the loss of investment expended in selecting, adopting and promoting the current name of its restaurant."  (Document No.13, ¶34)

Finally, as part of the relief requested by all defendants, they (again Konol and Bastianelli were included) requested "counterclaim-plaintiffs be awarded damages due to breach of contract by counterclaim-defendant."

Notwithstanding defendants being served a cease and desist letter on December 17, 2008 (**Exhibit 4**), defendants continued to use the intellectual property of Dino Drop.  The Defendants continued to infringe Dino Drop's trademark and trade dress through at least the end of May 2009. Photographic evidence obtained in January 2009 confirms that, notwithstanding the cease and desist letter, defendants continued to use Dino Drop's trademark and trade dress.  **Exhibit 5** Other evidence establishing defendants' continued infringement of Dino Drop's intellectual property after being

9

served with a cease and desist letter includes website documents (**Exhibit 6**) as well as minutes from at least one Northville City Council meeting in May 2009[7].  Those minutes include the following:

> **B.   Request to Transfer Ownership of a Class C and SDM licensed business with Dance-Entertainment permit and outdoor service from the Chase Bar & Grill, L.L.C. to BacMar, L.L.C. (Dino's Restaurant)**
>
> **It was also noted that Dino's is changing its name to "Northville Sports Den."**  The change of name will not affect the license transfer as the ownership is being transferred to BacMar, L.L.C.  The name of the business is not relevant if the business ownership does not change. **Exhibit 7** (emphasis added)

Philip Martinez also testified that he obtained an assumed name registration with Wayne County for Dino's Sports Lounge and/or Dino's Sports Grill and that he has taken no effort to alter or remove these registrations. (**Exhibit 2**, Philip Martinez deposition, p. 102) Mr. Martinez further testified that he authorized his counsel to file assumed names with the state for Dino's Sports Lounge and/or Dino's Sports Grill.  **Exhibit 2**, p. 102) Attached as **Exhibit 8** are filings with the State of Michigan evidencing that assumed names were obtained for Dino's Sports Lounge/Dino's Sports Grill on or about December 26, 2008, and that these remain active to this date notwithstanding this lawsuit and the cease and desist letter served in December 2008 and constituted continued infringement to this day.

Finally, additional evidence of infringement may be found in the menu utilized by "Dino's Sports Grill" (upon information and belief, the name eventually adopted after receiving the cease and desist letter) **Exhibit 9**

---

[7]Hence, defendants misrepresent in their motion for summary judgment on page 12 of Document Number 69, that "Plaintiff is unable to establish any period of time in which the use of the unregistered [common law] mark and trade dress occurred without authorization".

# LEGAL ANALYSIS

## Standard of Review

Summary judgment should be granted where there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record that establish the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden of showing that no genuine issue of material fact exists may be discharged by pointing out "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

> Once the moving party has met its burden, the nonmoving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial. *Id.* at 324. Although the Court must "view all the facts and the inferences drawn therefrom in the light most favorable to the nonmoving party," *United Rentals (N. Am.), Inc. v. Keizer*, 355 F.3d 399, 406 (6th Cir. 2004) (citation omitted), the nonmoving party must do more than show that there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party must present significant probative evidence to defeat the motion for summary judgment. *See Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993); *see also Anderson*, 477 U.S. at 249-50 ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.") (citations omitted).

11

Federal Rule of Civil Procedure 56(c) states that judgment shall be rendered if the movant shows there is no genuine issue as to any material fact. It is sufficient for the moving party to show that there is an <u>absence of evidence</u> to support the non-moving party's case. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-325 (1986), see also *Estate of Mauro v. Borgess Medical Center*, 137 F.3d 398 (6th Cir. 1998). The moving party need not submit any affidavits, but may merely highlight the opposing party's inability to make a sufficient showing on an essential element of a claim. *Celotex*, 477 U.S. at 322. Once the non-moving party's failure to make a showing sufficient to establish the existence of an essential element to its case has been highlighted, summary judgment must be entered. *Id.* at 322-23 (1986). See also *Gregg v. Allen Bradley Co.*, 801 F.2d 859, 861 (6th Cir. 1986).

### Liability

"Claims for trademark infringement and unfair competition are closely related and both hinge on the central issue of likelihood of confusion." *General Motors Corp. v. Keystone Automotive Industries, Inc.*, 453 F.3d 351, 352 (6th Cir. 2006). The court further held:

> Trademark infringement is a type of unfair competition . . . In many factual situations, the same result is reached whether the legal wrong is called trademark infringement or unfair competition. In such cases the courts often lump them together and speak of them as identical concepts. Today, the keystone of that portion of unfair competition law that relates to trademarks is the avoidance of a likelihood of confusion in the minds of the buying public. Whatever route one travels, whether it by trademark infringement or unfair competition, the signs give direction to the same query - whether defendant's acts are likely to cause confusion. *Id.*

The Sixth Circuit applies an eight factor test to determine the likelihood of confusion:

(1)     Strength of the plaintiff's mark;

12

(2)      Relatedness of the goods;

(3)      Similarity of the marks;

(4)      Evidence of actual confusion;

(5)      Marketing channels used;

(6)      Likely degree of purchaser care;

(7)      Defendant's intent in selecting the mark; and

(8)      Likelihood of expansion of the product lines.

See *Frisch's Rest., Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642 (6th Cir. 1982).

The ultimate determination of whether a given set of foundational facts establishes a likelihood of confusion is a legal conclusion. See *Winn Oil Co. v. Thomas*, 839 F.2d 1183, 1186 (6th Cir. 1998). While factual findings must be attempted with respect to the likelihood of confusion factor set out above, "a plaintiff need not show that all, or even most, of the factors listed are present in any particular case to be successful." *Id.* In the case *sub judice*, there exist no genuine issues of disputed material facts as to the existence of a likelihood of confusion between Dino's Lounge (Ferndale) and Dino's Sports Lounge a/k/a Dino's Sports Grill (Northville). In this case, without question, each of the eight factors are met. From its inception, the Northville establishment was to be a "sister" restaurant of Dino's as operated in Ferndale. The name is virtually identical, and in particular the primary mark "Dino's" is included in both names. Both establishments are restaurants, both utilize the same marketing channels, etc. Perhaps most telling is defendants' intent in selecting the mark (factor seven). Here we have testimony that Dino's Sports Lounge (Northville) was so named based on defendants' desire to be associated with Dino's Lounge (Ferndale).

13

## 1.  Strength of Plaintiff's Mark[8].

The strength of a mark is a factual determination of the mark's distinctiveness.  *Audi AG v. D'Amato*, 469 F.3d 534, 543 (6th Cir. 2006).  As evidenced by the marks at issue (**Exhibit 10**) the intellectual property owned by Dino Drop and used by defendants as Dino's Sports Lounge (and subsequently Dino's Sports Grill) is distinctive.  The stylized logo and caricature, over and above the name itself, evidence that the common law intellectual property at issue is strong.  The fact that defendants specifically solicited the use of the marks at issue from Dino Drop further evidences the strength and merit of the mark.  As noted previously, Mr. Bach testified that Mr. Martinez stated that he really liked the restaurant (Dino's Lounge) and that he would like to mimic it in Northville.  Mr. Bach specifically testified that it was Mr. Martinez' idea to mimic Dino's in Northville, referring to it as a sister restaurant.  **Exhibit 3**, pp. 28-29, 32-33.  Also, as noted previously, Mr. Martinez sought out and called Mr. Bach to inquire about Dino's and acknowledge that he had the ultimate say in what name was ultimately selected.  **Exhibit 2**, pp. 58-59 Without question this factor weighs in favor of Dino Drop and there can remain no question of fact.

---

[8]It is believed that defendants will argue that Dino Drop does not have any trademark or trade dress that could be infringed, despite defendants acknowledging that they licensed the right to use the name and trade dress.  This argument appears to be premised on the fact that Dean Bach, a restauranteur (and not an attorney) is unfamiliar with the term of art "secondary meaning." While it is true that Mr. Bach testified he was uncertain whether the Dino name and trade dress had "secondary meaning" this term was never defined for him.  However, when questioned about whether there was any value or distinction to the name and trade dress, Mr. Bach confirmed that indeed such distinctiveness existed.  Furthermore, a timely and appropriate objection was made to defense counsel's use of the term of art "secondary meaning" without defining it.  Furthermore, defendants are attempting to make a distinction simply between the word "Dino" as a name versus the stylized version of "Dino" used by defendants along with the trade dress at issue.  It is clear from Mr. Bach's testimony that while he is unfamiliar with the term of art "secondary meaning," he understands that the stylized name "Dino," his caricature (**Exhibit 10**), along with the overall trade dress and feel create a distinct impression which in technical terms is "secondary meaning."  Therefore, without question the common law mark and trade dress at issue are distinct and worthy of protection.

2.     **Relatedness of Goods.**

The Sixth Circuit evaluates the relatedness of goods and services by assigning the dispute in question a place within a "tri-part system". *Induct-O-Matic Corp. v. Inductotherm Corp.*, 747 F.2d 358, 363 (6th Cir. 1984). If the parties are in direct competition, confusion becomes likely when the marks are sufficiently similar. *Id.* In this case, it is clear that the parties are indeed direct competitors. Both are in the restaurant and bar business. The "relatedness of goods" is further evidenced by the fact that Philip Martinez, on behalf of defendants, specifically contacted Dino Drop (via its agent Dean Bach) about using the common law trademark and trade dress at issue in order to operate a "sister" restaurant in Northville. Without question this factor weighs in favor of Dino Drop and there can remain no question of fact.

3.     **Similarity of Marks.**

Similarity of marks is a factor of considerable weight. *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.,* 109 F.3d 275, 283 (6th Cir. 1997). Courts "must determine whether a given mark would confuse the public when viewed alone, in order to account for the possibility that sufficiently similar marks 'may confuse consumers who do not have both marks before them but who may have a 'general, vague, or even hazy, impression or recollection' of the other party's mark.'" *Id.* at 283. While the entire mark must be considered, the dominant portions of the mark receive greater weight in the likelihood of confusion analysis. *McCarthy on Trademarks and Unfair Competition*, §23.15[3] (1995). When one feature in a mark has greater impact on the potential buyer, it is properly given greater weight. *Aero-Motive Co. v. U.S. Aeromotive, Inc.*, 922 F.Supp. 29, 41 (W.D. Mich. 1996).

In this instance, the marks are virtually identical.  Plaintiff operates as "Dino's Lounge."

Using the same stylized version of the word "Dino's" (the dominant portion) defendants first

operated as "Dino's *Sports* Lounge" and later as "Dino's *Sports Grill*."  Under the analysis set forth

herein, it is clear that this factor weighs in favor of Plaintiff Dino's.

### 4.      Evidence of Actual Confusion.

Because of the recognized difficulty in securing evidence of actual confusion, "the lack of

such evidence is rarely significant." *Daddy's Junky Music Stores, Inc.,* 109 F.3d at 284.  Where such

evidence is present, however, it is weighed heavily.  *Id.*  Evidence of actual confusion has been

deemed the best evidence of a likelihood of confusion.  *Autozone, Inc. v. Tandy Corp.*, 373 F.3d 786,

798 (6th Cir. 2004).

In this case there exists actual consumer confusion.  This is evidenced by the uncontroverted

testimony of Mr. Bach wherein he testified he received emails and saw information on Craig's List

that clearly demonstrated confusion between the Northville Bar, still operating improperly as Dino's

and Dino's of Ferndale.  **Exhibit 3**, pp. 112-113.  Without question this factor weighs in favor of

Dino Drop, there remains no question of fact, and on this alone plaintiff is entitled to summary

judgment.

### 5.      Marketing Channels Used.

The parties' marketing channels consist of how, and to whom, the respective goods or

services of the parties are sold.  *General Motors Corp. v. Keystone Automotive Industries, Inc.*, 453

F.3d 351, 357 (6th Cir. 2006).  The greater degree in which the parties use the same or similar

marketing channels, the greater the likelihood of confusion.  *Blockbuster Entertainment Group v.*

*Laylco, Inc.*, 869 F.Supp. 505 (E.D. Mich. 1994).  "This factor involves two considerations: (1)

16

whether the parties use the same means to market the product, and (2) whether the 'predominant customers' are the same." *General Motors* at 357.

In this instance, both parties use word of mouth as well as internet advertising.  Both parties also provide their services to the same type of clientele.  Under the analysis established by the courts, this factor weighs in favor of Dino Drop and there can remain no question of fact.

**6.     Likely Degree of Purchaser Care.**

Generally, assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution.  See *Winn Oil Co. v. Thomas,* 839 F.2d 1183, 1186 (6th Cir. 1998).  Recognizing that defendants specifically chose to trade on the name and goodwill of Dino Drop, it is clear that sufficient care is used by the purchaser to seek out the defendants' restaurant if in the Northville area believing it was affiliated with Dino's Ferndale (a known quantity).  Therefore, without question this factor weighs in favor of Dino Drop and there remains no question of fact.

**7.     Defendants' Intent on Selecting the Mark.**

The intent of the defendants in a trademark action is relevant because "purposeful" copying indicates that the alleged infringer . . .  believes that his copying may divert some business from the senior user."  *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 286.  Direct evidence of intentional copying is not necessary to prove intent, rather, the use of the mark with knowledge of another's prior use supports an inference of intentional infringement.  *Winn Oil v. American Way Service Corp.*, 943 F.2d 595 (6th Cir. 1991).  In the case *sub judice*, it is clear from the testimony that it was defendants' intention to imitate Dino's Lounge (Ferndale) in selecting the mark.  Testimony clearly sets forth that Philip Martinez, on behalf of defendants, specifically sought out and contacted Dean

Bach about recreating Dino's Lounge (Ferndale) in Northville.  It is hard to imagine a situation where the intent of the defendants in selecting the mark at issue is any clearer.  As such, without question this factor weighs in favor of Dino Drop and there can remain no question of fact.

**8.     Likelihood of Expansion of the Product Lines.**

The strong likelihood that the alleged infringer will expand its business to compete with a senior user will contribute to a finding of a violation.  *Daddy's Junk Music Stores, Inc.*, 109 F.3d at 287.  In this case, the parties are already in the same business.  Without question this factor weighs in favor of Dino Drop and there can remain no question of fact.

The necessary *Frisch* factors having been met, without question, defendants' continued use of the Dino name and associated intellectual property after December 17, 2008, constitutes trademark/trade dress infringement.  Furthermore, as set forth in *General Motors Corp.*, *supra*, defendants' actions also constitute unfair competition.  As such, it is clear defendants are liable under plaintiff's complaint for each of the following counts:

- Count I - Unfair Competition, Lanham Act (15 U.S.C. §1125(a));

- Count II - Unfair Competition - Common Law;

- Count III - Infringement of Common Law Trademark; and

- Count IV - Infringement of Common Law Trade Dress[9]

Having engaged in these activities and/or otherwise violated Dino's intellectual property, plaintiff is entitled to permanent injunctive relief - Count VII.

---

[9]While the issue of monetary damages remains a question of fact for the jury, there can be no doubt that defendants are liable for having engaged in unfair competition and infringement of Dino's intellectual property.  Furthermore, the issue of monetary damages notwithstanding, plaintiff is entitled to judgment as a matter of law as to Count VII - Permanent Injunctive Relief.

Based on the uncontroverted facts, it is clear that defendants are individually and severally liable to plaintiff.  Philip Martinez, Teri Martinez and Adam Mason in their individual capacity (as well as members of alleged corporations) utilized the common law trademark and trade dress of Dino Drop to operate a bar located in Northville, Michigan.  This activity ran from September 2008 (when initially authorized) through April of 2009 despite being instructed via a cease and desist letter to stop such use in December 2008.  The corporate entities "The Chase Bar & Grill, LLC", "BacMar, LLC" and "Martinez Management Group" (a/k/a Martinez Group) are equally liable for the continued use of Dino Drop's trademark and trade dress after being advised to cease and desist.  These "corporations" are also responsible, just as the individuals are, for payment for use of the trade dress and trademark during the licensed period as no fee has ever been paid.

To the extent Philip Martinez, Teri Martinez and Adam Mason try to suggest that should there exist any liability, it is limited to the corporations, as the "corporations" were mere instrumentalities of these individuals and, were constructed to commit a wrong or fraud, the corporate structures should be disregarded.

While Michigan courts will generally respect the separate existence of corporate entities (*Wells v. Firestone Co.*, 421 Mich. 641, 650 (1984)), courts will disregard the separate existence when it is "used to defeat public convenience, justify wrong, protect fraud, or defend crime." *Paul v. University Motor Sales Co.*, 283 Mich. 587, 602 (1983).  Although disregarding a separate existence of corporation - - referred to as "piercing the corporate veil" - - is most often to protect a corporation's creditors, Michigan courts have recognized that the doctrine may be invoked to protect others when the equities are compelling. *Well, supra* at 650-651.  The equities will typically justify disregarding the separate existence of a corporate entity where (1) the entity is a mere instrumentality

19

of another individual or entity, (2) the entity was used to commit a wrong or fraud[10], and (3) there

was an unjust injury or loss.  See *Rymal v. Baergen*, 262 Mich. App. 274, 293-294 (2004).

The fiction of distinct corporate existence is a convenience introduced into the law to serve

the ends of justice.  *Wells* at 650.  "However, when this fiction is invoked to subvert justice, it may

be ignored by the courts."  *Foodland Distributors v. Al-Naimi*, 220 Mich. App. 453, 456 (1996).

The act of piercing the corporate veil, or disregarding the corporate entity, is "[t]he judicial

act of imposing personal liability on otherwise immune corporate officers, directors, and

shareholders for the corporation's wrongful act."  *Black's Law Dictionary (7ᵗʰ ed)* There is no single

rule stating when a corporate entity may be disregarded.  The courts view actions to pierce the

corporate veil on an case by case basis.  "Where a corporation is so organized and controlled and its

affairs so conducted as to make it a mere instrumentality or agent or adjunct of another corporation,

its separate existence as a distinct corporate entity will be ignored and the two corporations will be

regarded in legal contemplation as one unit."  *People v. Michigan Bell Telephone Co.*, 246 Mich.

198, 204-205 (1929).

In this instance the testimony elicited from the defendants Philip Martinez, Teri Martinez and

Adam Mason is that no effort was ever made to properly operate either BacMar or Martinez

---

[10]Although many courts have stated that the entity must be used to commit a wrong or fraud before the entity's separate existence may be disregarded, see *Rymal, supra* at 293, it is not clear that this is a necessary prerequisite to disregarding a corporation's separate existence.  Most of these cases rely on a line of authorities that originate with *Gledhill v. Fisher & Co.*, 272 Mich. 353 (1935).  But after the decision in *Gledhill*, the Supreme Court explained that proof of fraud is not a prerequisite for disregarding the separate existence of a corporate entity.  See *Herman v. Mobile Homes Corp.*, 317 Mich. 233, 243-245 (1947) (distinguishing *Gledhill, supra* and holding that a corporation's separate existence may be disregarded where the corporation is so dominated by another that it should be treated as a mere agent of its parent).  See also *Papo v. Aglo Restaurants*, 149 Mich. App. 285, 302 n 15 (1986) (noting that the Michigan Supreme Court, "on more than one occasion, has acknowledged that the corporate veil may be pierced in the absence of fraud.")

Management Group as viable entities.  No corporate meetings were ever conducted, no corporate minutes were ever kept, no tax returns have been filed.  Simply put, other than making a filing with the state, no effort has ever been made to operate these entities as proper corporations.  This, despite both Teri Martinez and Philip Martinez being Certified Public Accountants (CPA's).  These individuals are even uncertain as to what percent of shares they alleged own and/or what actually it is these corporations are suppose to do[11].  It is clear that these "corporations" are mere shams,

---

[11]Q.   Have you ever attended any corporate meetings for BacMar?

A.   Not that I'm aware of.

Q.   Are you aware of any minute books for BacMar?

A.   No.  **Exhibit 11**, Adam Mason deposition, p. 29. lines 21-25.

         *                  *               *

Q.   Do you review any of the tax returns or any other filings that are done on BacMar before its' done?

A.   No, I do not.

Q.   Do you know who does that?

A.   Phil does.

Q.   What percentage owner are you of BacMar, if you know?

A.   I'm not sure.

Q.   Do you know if any minute books are kept for BacMar?

A.   I do not.

Q.   Other than owning the liquor license for the restaurant bar, do you know if BacMar does anything else?

A.   I do not know.  **Exhibit 12**, Teri Martinez Deposition, pp. 9-10

With respect to the Martinez Group itself, Teri Martinez responded to questions as follows:

instrumentalities of the individuals who are listed as the corporate owners.  As such, plaintiff contends that to the extent defendants attempt to hide behind these "corporate" entities, the court should recognize the entities for what they are, pierce them and hold these individuals personally liable for the actions of the corporations over and above their own personal liability.

## CONCLUSION

Despite Bret Konol (majority shareholder of The Chase Bar & Grill) agreeing to sell the establishment at issue to Dino Drop, he ultimately sold it to the defendants.  Within days, if not hours, of this taking place, Philip Martinez, as lead defendant, contacted Dean Bach about Dino Drop and The Chase Bar forming an alliance.  Specifically, over the course of the next couple of days Dean Bach, as agent of Dino Drop, Philip Martinez, Teri Martinez and Adam Mason agreed to Dino Drop becoming a one third owner in the bar at issue as well as receiving other compensation  based on the Northville facility being a sister restaurant to the Dino's Lounge of Ferndale.  Based on these agreements, Dean Bach and other employees of Dino Drop worked feverishly to ensure the Northville location opened in sufficient time to prevent the liquor license from falling into escrow, a condition which could be terminal to the future of the Northville bar as it often take months to get a liquor license out of escrow.  Despite Dino Drop living up to its end of the bargain, defendants decided to take advantage of plaintiff and now argue there never existed any contract, they have

---

Q.     Do you know if there are any corporate books or minute books kept for this organization?

A.     I don't know.

Q.     Have you ever attended any corporate meetings for The Martinez Group?

A.     No. **Exhibit 12**, Teri Martinez Deposition, p. 16.

22

never improperly used any common law trademarks or trade dress of Dino Drop and have never

engaged in any unfair competition and do not owe plaintiff one red cent.

Notwithstanding defense counsel's attempt to negate the existence of Dino Drop's common

law intellectual property by questioning Mr. Bach about the term of art "secondary meaning"

(without defining it) it is clear that indeed there exists common law intellectual property that was

improperly used by defendants for which defendants are liable as a matter of law.

Each and every defendant is liable both in their individual capacity as well as "shareholders"

in the "corporations" formed.  As the corporate necessities have not been followed, it is clear that

these "entities" are mere instrumentalities of their "shareholders" and as such should be pierced.

Without question, liability exists as a matter of law as to Counts I, II, III and IV.

Furthermore, based on the court's finding of liability as to Counts I - IV plaintiff is entitled to

permanent injunction as requested in Count VII.

WHEREFORE, Plaintiff DINO DROP, INC., respectfully requests this Honorable Court

enter an order finding defendants engaged in unfair competition pursuant to the Lanham Act (15

U.S.C. §1125(a)); common law unfair competition; infringement of Dino Drop's common law

trademark; infringement of Dino Drop's common law trade dress; and that defendants are enjoined

from using any name, symbol or trade dress that is likely to cause confusion with the common law

trademark and trade dress owned by Dino Drop.

<div style="margin-left:40%">

GARAN LUCOW MILLER, P.C.

s/Timothy J. Jordan_____
TIMOTHY J. JORDAN (P46098)
ROBERT D. GOLDSTEIN (P38298)
Attorneys for Plaintiff/Counter Defendant
1000 Woodbridge Street
Detroit, MI   48207
(313) 446-5531
tjordan@garanlucow.com
P46098

</div>

Dated:  August 31, 2010

900907.1

23

## CERTIFICATE OF SERVICE

I hereby certify that on **August 31, 2010**, I electronically filed the foregoing document with the Clerk of the Court using the ECF System which will send notification of such filing to the following: John S. Artz, Esq., Robert D. Goldstein, Esq., Sheryl A. Laughren, Esq. and James P. Murphy, Esq.

GARAN LUCOW MILLER, P.C.

  s/Timothy J. Jordan
TIMOTHY J. JORDAN (P46098)
Attorneys for Plaintiff/Counter-Defendant
1000 Woodbridge Street
Detroit, MI 48207
(313) 446-5531
tjordan@garanlucow.com
P46098

24