UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DINO DROP, INC.,

        Plaintiff,

v.                                          Case No. 09-cv-10759
                                                  Paul D. Borman
                                                  United States District Judge

CHASE BAR AND GRILL, LLC,
BACMAR, LLC, MARTINEZ
MANAGEMENT GROUP,
BRET KONOL, DAVE BASTIANELLI,
PHILLIP M. MARTINEZ,
TERI MARTINEZ and ADAM MASON

        Defendants.

_____/

**ORDER (1) DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, (2)
GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AS TO COUNTS I
THROUGH IV, AND (3) ORDERING THAT DEFENDANTS ARE ENJOINED FROM
USING THE NAME "DINO'S" AND ANY SYMBOL OR TRADE DRESS THAT IS
LIKELY TO CAUSE CONFUSION WITH THE COMMON LAW TRADEMARK AND
TRADE DRESS OWNED BY DINO DROP**

**I. INTRODUCTION**

      Dino Drop, Inc. ("Plaintiff") is a Michigan corporation that owns and operates Dino's

Lounge – a restaurant and bar located in Ferndale, Michigan.  Dino's Lounge is managed by

Dean Bach.  Bach is a shareholder of Plaintiff, along with Duke Taylor.  The Chase Bar and

Grill, LLC ("Chase") is a Michigan company owned in part by Bret Konol and Dave Bastianelli.

The Martinez Management Group (the "Martinez Group") is an assumed name for an

unincorporated business that includes Phillip Martinez and his wife, Teri Martinez.  BacMar,

1

LLC ("BacMar") is a company owned in part by Teri Martinez and Adam Mason[1] (collectively with Chase, Konol, Bastianelli, the Martinez Group and Phillip Martinez, "Defendants").

Plaintiff filed the Complaint in this matter on February 27, 2009 [Dkt. No. 1]. Defendants answered on April 24, 2009 [Dkt. No. 12]. Now before the Court are Defendants' Motion for Summary Judgment, filed on August 27, 2010 [Dkt. No. 69], and Plaintiff's Motion for Partial Summary Judgment, filed on August 31, 2010 [Dkt. No. 72]. Responses were filed on September 30, 2010 [Dkt. Nos. 93 and 94] and replies were filed on October 15, 2010 [Dkt. Nos. 99 and 102]. Oral argument was held on December 16, 2010.

For the reasons stated below, the Court will:

(1) Deny Defendants' motion;

(2) Grant Plaintiff's motion as to Defendants' liability under Counts I through IV, and

(3) Order that Defendants are enjoined from using the name "Dino's" and any symbol or trade dress that is likely to cause confusion with Plaintiff's common law trademark and trade dress.

## II. BACKGROUND

Sometime in the Summer of 2008, Dean Bach and Defendant Phillip Martinez, independently, became aware that Defendants Konol and Bastianelli were interested in selling the Chase Bar and Grill, a restaurant and bar located in Northville, Michigan (the "Northville bar"). Both Bach and Martinez bid for the Northville bar (Pl.'s Mot. Ex. 2 - Martinez Dep. at 22-36; Defs.' Mot. Ex. B - Bach Dep. at 23); the bid from Martinez was accepted. However, Konol and Bastianelli were concerned about Martinez's lack of experience in the restaurant

---

[1]Adam Mason is Phillip Martinez's nephew.

2

industry.[2]  (Martinez Dep. at 41).  Moreover, because the Northville bar had been closed for some time, its liquor license was in danger of falling into escrow due to nonuse.[3]  Therefore, Konol and Bastianelli were interested in finding a seller who could open the Northville bar within a relatively short time frame.  To address these concerns, Martinez contacted Bach and set up a meeting at his restaurant in Ferndale.

Present at this initial meeting were Bach and Defendants Konol, Phil Martinez, and Teri Martinez.  The parties talked about the possibility of partnering to open the Northville bar:  Martinez would provide a capital investment, and Bach would provide the business know-how.  As Martinez recollected:

> A.    I pointblank [sic] asked Dean what do you want me for because you know why I want you, you're the – you got operations.
>
> Q.    And what was the response?
>
> A.    You got the money.
>
> Q.    So you have money, Dean has experience?
>
> A.    Yes.
>
> Q.    Where did the conversation go from there?
>
> A.    Let's see what we can work out.

---

[2]Specifically, the landlord for the building housing the Northville bar expressed this concern to Konol and Bastianelli.  (Martinez Dep. at 41).  Defendant Martinez is an accountant by trade and was doing "consulting work" prior to opening the restaurant involved in the instant matter.

[3]When a liquor license is in escrow, alcoholic beverages are prohibited from being sold on the premises, it cannot be transferred to another person or entity, and the owner must seek renewal from the local legislative body within one year.  *See* LCC Rule 436.1107(1) and 1107(2).

3

(Martinez Dep. at 45).  At the end of the meeting, in Bach's words, the parties formed "an agreement to agree."  (Bach Dep. at 32).

Over the next several weeks, Bach and Martinez discussed the Northville bar on various occasions.  Although there is disagreement about the exact content of those discussions, it is not disputed that Bach provided Martinez with recipes, menus, promotion and even staff from his Ferndale restaurant, in addition to guidance from his personal assistant, Nicole Cass.  This assistance was essential in getting the Northville bar open for a local festival in September 2008, which timewise saved the liquor license from escrow.  Martinez testified as follows:

> Q.    Was Dean Bach or any members of his staff of Dino's instrumental or in any way assist [sic] in the opening of the bar for the Victorian Festival?
>
> A.    I would say Nicole Cass was the one that was instrumental in making sure The Chase Bar & Grill was open for the Victorian Festival.
>
> [. . . .]
>
> Q.    When the bar opened for the Victorian Festival, did you at that point know whether or not Nicole Cass either had been or was also an employee of Dino's Ferndale?
>
> A.    I was aware that she was receiving $500 in cash a week from someone, whether it was Dino's Ferndale or Dean Bach.
>
> [. . . .]
>
> Q.    Are you aware of any other individuals being there that were somehow related to Dean Bach or Dino's Ferndale?
>
> A.    I can only imagine there were some.  Specifically who they were, I'm not aware.
>
> [. . . .]

4

Q.      . . . When you opened for the Victorian Festival weekend,
        of the universe of people that are there – and I don't know
        how many are there – how many of them do you recall
        being individuals that were specifically hired by the
        Martinez Group or by The Chase Bar & Grill?

A.      The Martinez Group has zero employees.  The Chase Bar
        & Grill is the legal entity that's running the bar.  All the
        employees right now today are Chase Bar & Grill
        employees.

[. . . .]

Q.      . . . How many of these Chase Bar & Grill employees are
        there, either by number or by percentage, to assist on this
        weekend, is it 70 percent, 90 percent, 50 percent, what was
        the percentage?

A.      Very, very small number because a lot – a lot of the
        employees were – were paid that night.

Q.      Almost like a part-time –

A.      Exactly.  So – so I don't know who made arrangements to
        have all these servers drop out of the sky for two days.

[. . . .]

Q.      Okay.  And you understood at this point why you were
        opening, and that was to keep the liquor license from
        falling into escrow, or did you not realize –

A.      No.  I was aware of that.  I mean, it's just common
        knowledge, you do a little bit of homework and, I mean,
        here I am going to spend $500,000 to buy a bar, I'm doing
        a little bit of homework on what it takes to run a bar.

Q.      No.  I appreciate that.  That's why I'm asking the question.

A.      So I was well aware of the fact that what causes liquor
        licenses to go into escrow, and so when The Chase Bar &
        Grill shut their doors it was, oh, crap.

Q.      The clock is ticking.

5

> A.   Okay.  And the Victorian Festival is big, there's still liquor inventory in The Chase Bar & Grill, so it just made good business sense to do whatever you can, even if you don't serve any food, just serve some beer and shots of whiskey, but just open those doors.

(Martinez Dep. at 50-54).  Likewise, Defendant Mason testified that Plaintiff was instrumental in operations after the September 2008 grand opening:

> Q.   Do you know who was involved in the selection of vendors in getting all the pieces of the puzzle together so you could actually function; get your alcohol, get your coffee, get your food, get things cleaned, linens, that type of thing?
>
> A.   I was under the impression it was Nicole Cass.
>
> Q.   And where did Nicole Cass work?
>
> A.   She worked for Mr. Bach.
>
> Q.   So she was affiliated with Dino's of Ferndale?
>
> A.   Yes.
>
> Q.   And as far as you know, she was involved in helping Dino's Northville get up and running by a selection of vendors and things of that nature?
>
> A.   Yes.

(Pl.'s Mot. Ex. 11 - Mason Dep. at 31).

When it initially opened, the Northville bar was called "Dino's Sports Lounge."  The menu included a caricature of Dean Bach under the phrase, "upscale but not uptight," along with a stylized "Dino's" logo.  The Dino's logo also appeared on outdoor awnings (Pl.'s Mot. Ex. 7 - photographs) and internally on windows within the bar.  Bach personally assisted with publicity for the Northville bar in the months following the grand opening:

> Q.   Do you have any recollection of what type of activities Mr.

6

> Bach did to try to help advertise Dino's Northville in the
> October, November, December time frame?
>
> A.   I distinctly remember Halloween, Dean was there. I recall
> the night Main Street Bank closed its doors, we were there
> late, six, 7:00 in the evening, and Dean went out, talked to
> the TV guys.  I recall Dean wanting to put an ad in Metro
> Detroit, or whatever the – one of those papers, magazines,
> are, and we – he sent me an invoice for $500 for the – for
> part of that.
>
> Q.   Do you know if he assisted in any charity events or
> anything to help promote the name and/or promote Dino's
> Northville being a good citizen?
>
> A.   There was a television morning show that he attended.  I
> didn't get a chance to see it, so I don't know exactly what
> was said, what he did.  I was told that, you know, he
> plugged the Northville location, so I have to believe he did
> . . .

(Martinez Dep. at 114-15).

Despite these efforts in getting Defendants' business started and saving its liquor license,

Defendants claim that Bach never broached the topic of compensation for his services or for the

use of his logo, menu, or other intellectual property.  Indeed, there is no dispute that Plaintiff has

never been compensated for any services or intellectual property provided in connection with the

opening of the Northville bar.

> Q.   What would he receive, if anything, for his time, energy,
> whatever he put into the business, what was he to receive in
> the way of compensation, if anything, during those first
> three years?
>
> A.   That was never really discussed.
>
> [. . . .]
>
> Q.   Do you know if Mr. Bach or Dino Drop was ever
> compensated not for out-of-pocket expenses, but for its

services provided, has that ever occurred, or is that that
4,000 that you calculated?

A.    I'm not aware of any time Dean would have been
compensated.

Q.    How about Dino Drop? Again, not for having made the
purchase of an advertisement or napkins, but use of the
name, expertise, some service?

A.    To the best of my knowledge, I don't recall.

(Martinez Dep. at 79, 115-16).  Instead, Defendants claim that Plaintiff was "donating" its

restaurant expertise, services and intellectual property to help the Northville bar open.

Defendants claim that Plaintiff did not expect to be paid for these "donations."

Q.    Do you know if there was ever any discussions in
compensating either Mr. Bach or Dino's Ferndale for any
efforts put toward the opening and running of Dino's
Northville?

A.    To my knowledge, there were no conversations, and given
the fact that I was donating my time to help, my husband
was donating his time, to me, it was – there would have
been no compensation expected to try to get a business up
and running.

Q.    But you were an equity owner, correct?

A.    Yes, I was an equity owner.

Q.    And Mr. Bach was not an equity owner, correct?

A.    That's correct.

Q.    As far as you know, it was never your intention for Mr.
Bach or Dino Drop to be paid for any whatever efforts they
made?

A.    That's correct. . .

(Pl.'s Mot. Ex. 12 - Teri Martinez Dep. at 39-40).  Defendants claim that Plaintiff had no reason

8

to expect any equity ownership as a result of its efforts in the grand opening and saving of the

liquor license, or in the subsequent promotion and other services contributed without

compensation, or from the use of Plaintiff's intellectual property in connection with the

Northville bar:

> Q. Do you know if Mr. Bach was ever to acquire any equity ownership in the bar or the liquor license?
>
> A. Absolutely not.  He was not.
>
> Q. From the inception, he was never going to have an equity ownership?
>
> A. Correct.
>
> Q. Do you know if – whether there were any discussions regarding Mr. Bach – Bach's name appearing on the liquor license as one of the owners?
>
> A. I don't recall any discussion.

(Teri Martinez Dep. at 30-31).  Nevertheless, Defendants Mason and Mrs. Martinez, who also

contributed their own uncompensated efforts in opening the Northville bar, both received

substantial equity ownership interests in the entity created to own the liquor license and run the

bar – BacMar, LLC.

Thus, although it is not disputed that the name "BacMar" was derived by combining the

first three letters of Bach's and Martinez's last names, Dean Bach has no ownership interest in

the company.  Instead, Defendant Mason owns 33 percent and Defendant Teri Martinez owns 67

percent.  (Martinez Dep. at 11).  Defendants claim that Bach has a zero ownership interest

because Bach was not willing to make a cash investment in the bar.

Eventually, Plaintiff was offered "5 percent equity ownership over a period of time" in

BacMar.  (Martinez Dep. at 78).  Under this agreement, Plaintiff would not receive anything for the first three years the Northville bar was in operation.  (Martinez Dep. at 78).

The relationship between Bach and Defendants broke down shortly after the opening, and on December 17, 2008, Bach's business partner, Duke Taylor, requested the removal of "any and all indicia which would associate [the Northville bar] with Dino's."  (Pl.'s Mot. Ex. 4 - Taylor Letter) (the "December 2008 letter").  Sometime thereafter, Defendants changed the name from "Dino's Sports Lounge" to "Dino's Sports Grill."  Later, the name was changed again to the "Northville Sports Den."

Plaintiff argues that Defendants continued to use its logo and other intellectual property after receiving the December 2008 letter.  Plaintiff also argues that it had a binding contract with Defendants entitling Plaintiff to a 33 percent ownership interest in BacMar, as well as 10 percent of the gross revenues and three percent of the gross proceeds, for a license to use its intellectual property.  Defendants argue that Plaintiff's claims are frivolous, that it is not entitled to compensation for use of its intellectual property, and any usage stopped within a reasonable time after receiving the December 2008 letter, and that Plaintiff has no evidence of any agreement with Defendants.  Plaintiff has moved for summary judgment as to its trademark claims only, while Defendants have moved for summary judgment as to all of Plaintiff's claims.

### III.  LEGAL STANDARD

Plaintiff and Defendants have filed cross Motions for Summary Judgment pursuant to Fed. R. Civ. P. 56(c).  In deciding these Motions, the Court views the evidence and draws all reasonable inferences in favor of the party opposing summary judgment.  *Matsushita Electric*

*Industrial Co., Ltd., et al. v. Zenith Radio Corp., et al.*, 475 U.S. 547, 587 (1986).  The moving party bears the initial burden of showing that there is no genuine issue of material fact.  *Id*.  Once this burden is met, the opposing party must produce some facts showing there is a genuine issue for trial.  *Id*.  If a rational trier of fact could not, based on the record as a whole, find in favor of the party opposing summary judgment, then summary judgment is granted in favor of the moving party.  *Id*.

## IV.  ANALYSIS

In Counts I to IV, Plaintiff claims Defendants are liable for trademark violations under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and under Michigan common law.  (Compl. ¶¶ 33-50).  Both Defendants and Plaintiff have moved for summary judgment on these claims.

There are two aspects to Plaintiff's trademark claims.  First, the Court addresses Plaintiff's claims arising out of Defendants' use of the "Dino's Lounge" mark.  Secondly, the Court will address Plaintiff's "trade dress" claims relating the Defendants' use of the Dino's logo.

## A.  Secondary Meaning of Plaintiff's "Dino's Lounge" Mark

As a general rule in trademark law, personal names are "descriptive" terms and are only protected if they have acquired a secondary meaning.  *See generally Circuit City Stores, Inc. v. CarMax, Inc.*, 165 F.3d 1047, 1054 (6th Cir. 1999) (noting that "Proof of 'secondary meaning' is required for the protection of marks perceived by the public to be 'personal names.'"); *see also Habeeba's Dance of the Arts, Ltd. v. Knoblauch*, 430 F.Supp.2d 709, 716 (S.D. Oh. 2006) (same).  It is not disputed that "Dino" is a nickname for Dean Bach.

Defendants first argue that Plaintiff has conceded the issue of secondary meaning

because Bach stated at his deposition that the name "Dino" does not have a secondary meaning:

> Q.      Do you take the position that the name Dino has a
>          secondary meaning?
>
> A.      No comment. It does not.

(Bach Dep. at 124).

Setting aside the issue of whether Bach – who is not a lawyer – understood the meaning of the legal term "secondary meaning," the entirety of the deposition reflects that this issue has not been conceded.  Bach also gave testimony that supports a finding of secondary meaning. (Bach Dep. at 134-36, 165).  Thus, while Defendants may use Bach's contradictory statement against him in an attempt to impeach his testimony, this does not mean the issue of secondary meaning has been conceded by Plaintiff.

Courts in this Circuit look to seven separate factors in determining whether a mark has acquired secondary meaning: (1) direct consumer testimony; (2) consumer surveys; (3) exclusivity, length and manner of use; (4) amount and manner of advertising; (5) amount of sales and number of customers; (6) established place in the market; and (7) proof of intentional copying.  *DeGidio v. West Group Corp.*, 355 F.3d 506, 513 (6th Cir. 2004).  Courts have held that intentional copying of a competitor's trade dress or mark "raises a presumption of secondary meaning which may be rebutted only by showing an alternative logical reason for copying." *Goscicki v. Custom Brass & Copper Specialities, Inc.*, 229 F. Supp. 2d 743, 754 (E.D. Mich. 2002); *see also DeGidio v. West Group Corp.*, 191 F. Supp. 2d 904, 917 (N.D. Oh. 2002).

There is strong evidence of intentional copying in this case.  Shortly after opening, Defendants' bar was advertised and promoted in connection with Plaintiff's location in Ferndale. (Pl.'s Resp. Ex. 17 - Article from *Northville Record*) (referring to the "Northville Dino's" and

stating it "will provide the same menu that's offered at the Ferndale restaurant").  Defendant

Martinez also admitted that there could be confusion with the Ferndale location:

>    Q.    . . . Do you believe that it's possible for there to be
>           confusion as to whether or not there was linkage of
>           ownership between the bar you were operating when
>           operating as Dino's Sports Lounge in Northville and the
>           operation of Dino's Lounge in Ferndale?
>
>    A.    Today, I would say there's no confusion.
>
>    Q.    I'm not saying today, but when you were operating as
>           Dino's Sports Lounge in October, November and perhaps
>           part of December, if someone heard that name and also was
>           aware of Dino's in North – in Ferndale, do you believe that
>           individual –
>
>    A.    October, November of –
>
>    Q.    2008.
>
>    A.    – 2008.
>
>    Q.    Yes.
>
>    A.    There could be some confusion.

(Martinez Dep. at 103-04).  Defendant Martinez further admitted that after he received the

December 2008 letter requesting the removal of "any and all indicia which would associate [the

Northville bar] with Dino's," he made the decision to change the name to "Dino's Sports Grill."

(Martinez Dep. at 67).  Clearly, this change did not respond to the request in the December 2008

letter.

Defendant Martinez does not explain why he changed the name to "Dino's Sports Grill"

before changing it a third time to "The Northville Sports Den."  The most obvious reason seems

to be to avoid the appearance of a change of ownership, or to maintain the appearance of a

connection with the Ferndale location that Plaintiff and Defendants had clearly been promoting. It is also clear from Plaintiff's December 2008 letter, and from the standpoint of common sense, that Plaintiff was not taking issue with the word "Lounge" in Defendants' chosen name, but the word "Dino's," and that Defendants' decision to first change the name to "Dino's Sports Grill" was not a good faith attempt to comply with Plaintiff's request.  Therefore, the fact that Defendant Martinez decided to retain the name "Dino" after December 2008, and to keep the Dino's logo at least on the outdoor awning of the Northville bar, is evidence of intentional copying.  This raises a presumption in favor of secondary meaning.  In the absence of an alternative logical reason for Defendants' copying, which Defendants have not provided, the Court finds that Plaintiff's "Dino's" mark has secondary meaning.

## B. Likelihood of Confusion

On summary judgement of claims under § 43(a) of the Lanham Act, the Court must determine whether Plaintiff has established as a matter of law that the Defendants' use of its mark creates a likelihood of confusion.  *Express Welding, Inc. v. Superior Trailers, LLC*, 700 F. Supp. 2d 789, 797 (E.D. Mich. 2010).  This same standard is applied to common law trademark and unfair competition claims arising under Michigan law.  *See Wynn Oil Co. v. American Way Serv. Corp.*, 943 F.2d 595, 604 (6th Cir. 1991).

The Sixth Circuit applies an eight-factor test in determining a likelihood of confusion: (1) the strength of the Plaintiff's mark; (2) relatedness of the goods; (3) similarity of the marks; (4) any evidence of actual confusion; (5) the marketing channels used; (6) the likely degree of purchaser care; (7) Defendants' intent in selecting the mark; and (8) the likelihood of expansion of the product lines.  *See Frisch's Restaurants v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d

14

642 (6th Cir. 1982).

> These factors imply no mathematical precision, but are simply a
> guide to help determine whether confusion is likely. They are also
> interrelated in effect. Each case presents its own complex set of
> circumstances and not all of these factors may be particularly
> helpful in any given case. But a thorough and analytical treatment
> must nevertheless be attempted. The ultimate question remains
> whether relevant consumers are likely to believe that the products
> or services offered by the parties are affiliated in some way.

*Homeowners Group, Inc. v. Home Marketing Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir.

1991). The emphasis is on the "ultimate question," and "a genuine dispute of material fact on

any one of the eight factors does not demonstrate that a grant of summary judgment was

improper when there is not enough total evidence for a jury to conclude that the junior mark is

likely to confuse costumers." *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 793 (6th Cir. 2004).

## 1. Strength of the Mark

"The strength of a mark is generally the result of (1) its unique nature; (2) its owner's

intensive advertising efforts; and (3) which of the four categories the mark occupies: generic,

descriptive, suggestive or arbitrary/fanciful." *Express Welding*, 700 F. Supp. 2d at 797-98.

> A "fanciful" mark is a combination of letters or other symbols
> signifying nothing other than the product or service to which the
> mark has been assigned (e.g., Exxon, Kodak). An "arbitrary" mark
> has significance recognized in everyday life, but the thing it
> normally signifies is unrelated to the product or service to which
> the mark is attached (e.g., Camel cigarettes or Apple computers).
> Fanciful and arbitrary marks are considered to be the "strongest"
> or most distinctive marks. Encroachment on a strong mark tends
> to produce the greatest likelihood of confusion. "Suggestive" and
> "descriptive" marks either evoke some quality of the product (e.g.,
> Easy Off, Skinvisible) or describe it directly (e.g., Super Glue).
> Such marks are considered "weaker," and confusion is said to be
> less likely where weak marks are involved.

*Little Caesar Enterprises, Inc. v. Pizza Caesar, Inc.*, 834 F.2d 568, 571 (6th Cir. 1987). Even an

arbitrary or fanciful mark can be considered weak if it uses a word that is commonly found in other trademarks. *See AutoZone*, 373 F.3d at 794 (finding "AutoZone" mark was weaker than an arbitrary or fanciful mark because the word "zone" "is commonly found in other trademarks").

There is evidence in the record of Plaintiff's advertising efforts in connection with the word "Dino's." Indeed, Defendant recognized its unique character in soliciting the name for its business, and for continuing to use that unique name after Plaintiff's December 2008 letter. Because the word "Dino's" is not suggestive or descriptive of the Plaintiff's product, there is no lessening of the strength of the mark. Thus, the Court finds that Plaintiff's "Dino's" mark is strong, and this factor supports a likelihood of confusion.

**2. Relatedness of the Goods**

Defendants and Plaintiff are both in the restaurant industry. They both compete in the area of Southeastern Michigan. They both manage bar and grill-type restaurants that offer relaxed dining with American-style cuisine. Given the substantial similarities between the products offered, the Court finds this factor to weigh strongly in favor of a likelihood of confusion.

**3. Similarity of the Marks**

As noted above, the marks used by Defendants were more than just similar to Plaintiff's – they were exactly the same. After receiving the December 2008 letter, Defendants continued to associate the Northville bar with the name Dino's. That they changed the last word from "Lounge" to "Grill" is not material, as Plaintiff's were clearly taking issue with the word "Dino's" in the December 2008 letter. Thus, this factor strongly weighs in favor of a likelihood of confusion.

16

**4. Evidence of Actual Confusion**

Bach testified that there were some instances of actual confusion between Defendants' and Plaintiff's restaurants after Bach was no longer associated with the Northville bar. (Bach Dep. at 112-13). This evidences actual confusion. *See Express Welding*, 700 F. Supp. 2d at 799 ("While there is only a single incident of actual confusion in the record, that is some evidence of actual confusion."). This factor weighs in favor of a likelihood of confusion.

**5. Marketing Channels Used**

Here, the Court considers (1) what means the parties use to market their product, and (2) who their "predominant customers" are. *General Motors Corp. v. Keystone Automotive Indus. Inc.*, 453 F.3d 351, 357 (6th Cir. 2006). The first consideration does not weigh in favor of confusion, because Plaintiff and Defendants both utilize free marketing channels via Internet sites and word of mouth. Neither party has a great degree of control over how its business is advertised. However, the second consideration weighs in favor of confusion. Although they are geographically located in different cities, both restaurants are in Southeastern Michigan, and both restaurants target customers interested in casual, family dining with bar and grill-type cuisine. This factor weighs in favor of confusion.

**6. Likely Degree of Purchaser Care**

The restaurants at issue offer casual dining with mid-range pricing. Therefore, customers are likely to use a lower degree of care than they would with a fine dining restaurant. However, Plaintiff does not offer any evidence of a low degree of customer care, and Defendants offer nothing showing a high degree of customer care. Thus, this factor weighs in favor of neither outcome.

17

**7.  Intent in Selecting the Mark**

As already noted *supra* in Part A, there is evidence that Defendants intended to benefit by using and then post-December 2008, continuing to use the Dino's mark.  "[This] fact alone may be sufficient to justify the inference that there is confusing similarity."  *Wynn Oil Co.*, 839 F.2d at 1189 (citations and internal quotations omitted).  This factor weighs in favor of confusion.

**8.  Likelihood of Expansion of the Product Lines**

Neither party has presented any evidence that they are interested in expanding their respective businesses.  Therefore, the Court deems this factor not relevant in the instant case.

**9. Conclusion**

The Court finds that six of the factors weigh in favor of a likelihood of confusion, while no factor weighs against it.  Thus, the Court finds that Plaintiff has met its burden of showing that a likelihood of confusion could result from Defendants' use of its mark.

Defendants argue that even if Plaintiff can show a likelihood of confusion, it cannot show that any infringing activity took place after Plaintiff's December 2008 demand to cease using the name "Dino's."  The facts prove otherwise.  Plaintiff has produced photographs of the Northville bar displaying the "Dino's" logo, which are date-stamped for January 2, 2009.  (Pl.'s Resp. Ex. 7).  Defendants' admission that they continued using the "Dino's" name after December 2008, despite having time to change the second part of the name from "Sports Lounge" to "Sports Grill," undermines the argument that they changed the name within a reasonable time. Moreover, Defendants filed Certificates of Assumed Name for Dino's Sports Lounge and Dino's Sports Grill in late December 2008 (Pl.'s Mot. Ex. 8 - Certificates), which further undermines the argument that they intended to stop using the name "Dino's" in association with the

Northville Bar.  Finally, there is evidence that Defendants were still using the name "Dino's" to some extent as late as May 2009.  (Pl.'s Mot. Ex. 7 - Northville City Council Minutes).  Viewing the evidence in a light most favorable to the Plaintiff, a reasonable juror could find that some infringing activity did take place.

## C.  Trade Dress

The Sixth Circuit has held the elements of a trade dress claim under § 43(a) to be: (1) that the trade dress in question is distinctive, (2) that the trade dress is primarily nonfunctional, and (3) that the trade dress of the competing good is confusingly similar.  *Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc.*, 280 F.3d 619, 629 (6th Cir. 2002).  "The first two elements are the requirements for protectability, and the third element is the standard for evaluating infringement."  *Id*.  A mark qualifies under the distinctiveness requirement if it is inherently distinctive or if it has acquired secondary meaning.  *Id*. at 635.  Under the second element, a trademark must not protect "functional product features" that are "the province of patent law[.]" *Id*. at 640.  Finally, under the third element the Court applies the likelihood of confusion factors.  *Id*. at 645.

The Court first addresses Plaintiff's trade dress claims regarding any continued use of its menu after the December 2008 letter.  Plaintiff claims that Defendants infringed on its intellectual property by using similar meal descriptions and a similar layout, or "flow," in its menu.

The term "trade dress" is broadly defined as including "the design and appearance of the product as well as that of the container and all elements making up the total visual image by which the product is presented to customers."  *Id*. at 630 (quoting *Jeffrey Milstein, Inc. v.*

19

*Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 31 (2d Cir. 1995)).  In *Abercrombie & Fitch Stores*, the

Sixth Circuit held that this definition included a quarterly sales catalog "because the Quarterly is

a freestanding product that has its own trade dress, an objectively observable 'particular sales

technique' used to sell clothing, or packaging of the products it depicts."  *Id*. at 633.  The Court

further refined this language in a footnote:

> Abercrombie can seek protection of its Quarterly because
> Abercrombie closely associates in time and space – as indicated by
> the Quarterly's sales-related content and its display in
> Abercrombie stores – the visual images contained in the Quarterly
> with its products. . . . [T]he design of the Quarterly can properly be
> regarded as a component of the trade dress of Abercrombie's
> clothing insofar as it constitutes a particular sales technique . . . or
> some *tertium quid* that is akin to product packaging that would
> normally be taken by consumers *as an indication of source*[.]

*Id*. at n. 10 (citations and punctuation omitted) (emphasis added).

This language can apply to a restaurant menu.  The Court finds that the menu in the

instant case, and the items and descriptions in that menu, were so closely related to Plaintiff's

restaurant so as to be an indication of their source.  Thus, while Plaintiff's menu offers basic

appetizers, salads, burgers, sandwiches and entrees that can be ordered in most bar and grill

restaurants (Pl.'s Resp. Ex. 11 - Menu), the meal descriptions contain specifically unique

signifiers that indicate their source as Plaintiff's restaurant, to wit, Defendants use phrases like

"Dino's chop sauce" and "Dino's 'secret recipe' BBQ sauce" in the menu, which infringe on the

Dino's mark as explained *supra* in Part B.  Plaintiff has also presented the deposition testimony

of Dean Bach and the menu itself as evidence that its menu items benefit from a secondary

meaning.  This evidence is sufficient to meet the evidentiary burden Plaintiff bears on this issue.

*DeGidio*, 355 F.3d at 514.  A critical factor is that Plaintiff has established that Defendants

20

intentionally copied and used Plaintiff's work/mark, and that the copying was done to derive a benefit from the reputation of another. Therefore, the Court finds that Plaintiff's claims regarding the similarity of descriptions in Defendants' menu meets the distinctiveness requirement under *Abercrombie*.

The Court now turns to Defendants' use of Plaintiff's stylized "Dino's" logo. This logo is very distinctive and clearly an indicator of the source of the menu. It is also non-functional, inasmuch as the only function of the Dino's logo is to indicate its source as Dino's Lounge. Thus, the Court finds that the logo is entitled to trade dress protection. In addition, applying the same likelihood of confusion analysis as above, *supra* at Part B, the Court finds that it is likely that Plaintiff has met its burden in showing that Defendants' use of the stylized Dino's logo was likely to confuse consumers.

To summarize Plaintiff's trade dress claims, the Court upholds Plaintiff's claims regarding Defendants' use of similar food descriptions and layout in its menu, and all claims arising from Defendants' use of the stylized Dino's logo.

**D.  Liability of Certain Defendants as Individuals**

Plaintiff argues that Philip Martinez, Teri Martinez and Adam Mason are individually liable for the violations alleged in its Complaint. Generally, individuals are not liable for wrongs they commit as agents or shareholders of corporations except to prevent fraud or injustice. *In re RCS Engineered Products Co., Inc.*, 102 F.3d 223, 226 (6th Cir. 1996). In order to "pierce the corporate veil," a plaintiff must show three elements: (1) the corporate entity is a mere instrumentality of another, (2) the corporate entity was used to commit a wrong or fraud, and (3) there was an unjust loss or injury to the plaintiff. *Id.*

21

Defendants operated the Northville bar through the Martinez Group and BacMar, LLC. Plaintiff argues that BacMar is merely an alter ego for Defendants because Philip Martinez admitted that the entity has never had a meeting or filed a tax return. (Martinez Dep. at 16). However, BacMar apparently does not possess any assets at this point. (Martinez Dep. at 12-14). Further, the Court notes that limited liability companies like BacMar require less formality than a corporation. Therefore, given the relatively limited role BacMar appears to be playing at this point in Defendants' business, the lack of tax return filings and meeting minutes is not necessarily evidence of fraud. There is no evidence in the record that reflects a misuse of this LLC form for a wrongful purpose. *Longhi v. Animal & Plant Health Inspection Service*, 165 F.3d 1057, 1061 (6th Cir. 1999).

However, counsel for Defendants conceded at oral argument that the Martinez Group is simply an assumed name, not an incorporated entity. Accordingly, Defendants cannot claim limited liability under Michigan law and are individually liable for their actions as agents of the Martinez Group. *See generally* Mich. Comp. Laws §§ 450.1101 and 450.4101.

**E.  Breach of Contract Claims**

Plaintiff claims that:

> Defendants agree that plaintiff would have a 33% ownership in Dino's Sports Lounge as [sic] receive one third (1/3) of the ten percent gross revenues paid through the Martinez Management Group along with a three percent (3%) monthly gross proceeds licensing fee.

(Compl. ¶ 52). Plaintiff claims that Defendants' failure to honor this agreement amounts to breach of contract. Defendants' argue that Plaintiff cannot prove that any contract existed with Defendants.

22

Viewing the evidence in a light most favorable to Plaintiff, there is more than enough evidence on which a reasonable juror could find the existence of a contract. There are two specific relevant facts that support this conclusion.

First, Dean Bach refers to an evening at the Northville bar when he and Phil Martinez allegedly came up with the name "BacMar" and agreed to certain ownership interests. This agreement was formalized, so to speak, by Martinez writing it down on a bar napkin and each party throwing in one dollar as the apparent consideration.

Q.     Where was – at what point in time did the written contract come into play?

A.     At some point Phil, Adam, and myself were sitting at the bar trying to come up with a name for the entity that was going to be the purchaser and we came up with BACMAR and at that point Phil took out a napkin, put the name BACMAR on it and asked each of us for a dollar. He took the dollar and said we haven't – scribbled some stuff, we signed it and that was the extent of a written agreement that we had.

[. . . .]

Q.     Was this something along the lines of an agreement to agree?

A.     I think it was a little more forward than that.

Q.     In what way was it a little more forward?

A.     We had an agreement as to the terms of the partnership.

Q.     In your mind, it was a done deal at that point?

A.     At that point, we could move forward with getting the place open, in my mind, yes.

(Bach Dep. at 76-77). This event was verified by Phil Martinez:

23

> Q.     Do you recall any meeting where among the individuals
>        present, it was at least you, Adam and Mr. Bach wherein a
>        dollar was tossed down on a napkin and said, okay, we're
>        going to be partners?
>
> A.     Ask that question again.
>
> Q.     Certainly.  Do you recall any meeting taking place – and I
>        don't know the universe of individuals who would have
>        been present at the meeting, but at a minimum it would
>        have been you, Adam Mason, your nephew, and Dean Bach
>        where there were discussions regarding ownership or
>        management and everyone threw a dollar down on a napkin
>        or on a table and said we're going to be partners?
>
> A.     I recall sitting at the bar –
>
> Q.     When you say the bar, which –
>
> A.     The Chase Bar & Grill.
>
> Q.     Okay.
>
> A.     And we were trying to come up with the new name of the
>        entity, and somewhere during that meeting of having a
>        drink, it was mentioned, well, everybody could thrown a
>        dollar in and set up a new company and we could call it
>        whatever, yes, I recall that happening.

(Martinez Dep. at 83-84).  Further, that the entity name BacMar derives from the surnames of

Bach and Martinez provides some support to Plaintiff's claim of a meeting of the minds.  While

this obviously does not entirely support the detailed ownership and licensing fee claims Plaintiff

makes in its Complaint, it is some evidence that a contract existed between Plaintiff and

Defendants.

Secondly, there is evidence that Plaintiff was treated as an owner, or was at least led to

believe he would be an owner.  David Mason stated that there were discussions in the fall or

summer of 2008 in which Plaintiff would receive an ownership interest based entirely on the

24

services he provided in getting the Northville bar started.  (Mason Dep. at 21-22).  This supports Bach's claim that his ownership interest would be based on his "Knowledge and know-how." (Bach Dep. at 37).

In addition, an October 16, 2008 article in the Northville Record refers to Dean Bach as a "co-owner."  (Pl.'s Resp. Ex. 17).  And again, in an e-mail from Phil Martinez to Bach, in the context of Bach's asking for free drinks at the Northville bar, Martinez stated, "I am hopeful that you respect the fact that my investors are not investing *to provide the owners*, including Adam, me and our families, with free food and drinks."  (Defs.' Mot. Ex. D - November 7, 2008 E-mail) (emphasis added).  Viewing the evidence in a light most favorable to Plaintiff, this sentence in Martinez's e-mail to Bach states that none of the owners – including Bach – were allowed to have free drinks.

Defendants argue that, even if a contract existed, Plaintiff terminated the contract pursuant to the December 2008 letter.  This would hold true if Defendants did not commit a substantial breach of the contract prior to Plaintiff's termination.  "He who commits the first substantial breach of a contract cannot maintain an action against the other contracting party for failure to perform."  *Chrysler Int'l Corp. v. Cherokee Export Co.*, 134 F.3d 738, 742 (6th Cir. 1998) (quoting *Ehlinger v. Bodi Lake Lumber Co.*, 324 Mich. 77, 89 (1949)).  Based on the evidence in the record, it is not clear whether a contract existed, and if one did, what the terms of that contract were.  Therefore, the Court cannot determine at this time whether Defendants' behavior constituted a "substantial breach," justifying Plaintiff's December 2008 letter and the instant lawsuit.

There is evidence in the record upon which a reasonable juror could find that an

ownership agreement of some sort existed between Plaintiff and Defendants.  The existence of

the agreement, and its terms if it did exist, are questions of fact that should be decided by a jury.

**F.  Unjust Enrichment**

Defendants' argument for dismissal of Plaintiff's unjust enrichment claim is based on

subject matter jurisdiction.  Because a question of fact exists with regard to Plaintiff's trademark

claims, this Court has subject matter jurisdiction and supplemental jurisdiction over Plaintiff's

unjust enrichment claim.  Accordingly, this claim will not be dismissed.

**G.  Defendants Konol and Bastianelli**

Plaintiff sought dismissal of Defendants Konol and Bastianelli, but Defendants refused to

stipulate to the dismissal unless Plaintiff agreed to pay sanctions.  Pursuant to an Order issued on

December 23, 2010, the Court has dismissed these Defendants without prejudice [Dkt. No. 107].

## V.  DEFENDANTS' MOTIONS FOR SANCTIONS

Associated with their Motion for Summary Judgment, Defendants have filed three

motions for sanctions,[4] which are currently before Magistrate Judge Hluchaniuk.  Previously,

Defendants have filed three other motions for sanctions regarding discovery matters in this case.

[Dkt. Nos. 50, 60 and 67].  These previous motions have all been referred to Magistrate Judge

Hluchaniuk, who is by this point quite familiar with the litigants in this matter and their litigation

strategies.

Without addressing the merits of Defendants' pending motions for sanctions, the Court

agrees with the following statement by Magistrate Judge Hluchaniuk: "While the [C]ourt does

---

[4]The specific motions for sanctions have been filed by Defendant Dave Bastianelli and
Bret Konol [Dkt. No. 70], "all Defendants" [Dkt. No. 74], and Defendant Teri Martinez [Dkt.
No. 77].

26

have discretion, under Rule 37(a)(5), to award sanctions to the prevailing party . . ., the undersigned believes that sanctions should only be awarded where the opposing party's conduct was clearly without justification."  Order Regarding Defendant's Motion to Compel Discovery at 14 [Dkt. No. 57].

## V.  CONCLUSION

For the reasons stated above, the Court will:

1.  **DENY** Defendants' Motion;

2.  **GRANT** Plaintiff's Motion as to its claims in Counts I through IV;

3.  **ORDER** that Defendants are enjoined from using the name "Dino's" and any symbol or trade dress that is likely to cause confusion with the common law trademark and trade dress owned by Dino Drop.

The factual questions remaining in this case are the extent of Defendants' liability under the trademark claims in Counts I through IV, and the extent of Defendants' liability, if any, under the contract claims in Counts V and VI.

**SO ORDERED.**


S/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  February 24, 2011

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on February 24, 2011.


S/Denise Goodine

27

Case Manager